UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JACINTO PENA and
PARNELL SEATON,

                    Plaintiffs,

v.

MIKE BROWN et al.,

                    Defendants.
_____/

Case No. 2:20-cv-250

Honorable Hala Y. Jarbou

## OPINION

This is a civil rights action brought by two state prisoners under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim. The Court also will deny as moot Plaintiff's pending motion for class certification.

## Discussion

### I.     Factual allegations

Plaintiff Pena presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa

County, Michigan.  Plaintiff Seaton presently is incarcerated at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan.  The events about which Plaintiffs complain occurred at both of those facilities.   Plaintiffs sue the following Defendants in their official and personal capacities:  KCF Warden Mike Brown; KCF Grievance Coordinator L. Becher; KCF Correctional Official Unknown Party #1 (named as "John Doe #1"); URF Warden Connie Horton; URF Correctional Officers Unknown Parties ##2–5 (named as "John Does ##2–5"); URF Grievance Coordinator M. McLean; and URF Nurses Unknown Parties ##6 through 7 (named as "Jane Does ##1–2").

The factual allegations of Plaintiffs' complaint are divided into two sections.  The first section does not use any Plaintiff's name, but instead uses the pronoun "I" throughout. (Compl., ECF No. 1, PageID.5–16.)  The second set of allegations is labeled "Parnell Seaton-El's Statement of Claims" (*Id.*, PageID.17), and consists of three pages of factual allegations (*Id.*, PageID.17–20).  The Court concludes that the first section recites Plaintiff Pena's allegations.

Plaintiff Pena's claims concern ostensible violations of the Eighth Amendment during the early days of the COVID-19 pandemic at KCF.  Plaintiff Pena alleges that, on February 27, 2020, he was transferred from Carson City Correctional Facility to KCF.  He was assigned to an eight-man cubicle in housing unit D-2.  Like all of the seven units at KCF, housing unit D has two sides, D-1 and D-2, and each side has two rows of five eight-man cubicles.  All residents of the units are out and about simultaneously and share the same showers, quiet room, television room, and recreational equipment.  Plaintiff Pena alleges that, given the small living areas, it is impossible to achieve social distancing.

Before Plaintiff Pena arrived at KCF, officials allegedly discovered suspected cases of COVID-19 and took measures to ensure that all of the prisoners who resided in the same unit

2

as a person suspected of having COVID-19 would be kept separated from him.[1]  However, on

March 24, 2020, at approximately 11:00 p.m., prisoner Williams complained to a nurse that he

was experiencing shortness of breath and chest pain.  After the nurse checked Williams' vital signs,

she sent him back to his housing unit.  Williams reported continuing symptoms to a nurse the

following morning.  Shortly thereafter, at about 11:30 a.m. on March 25, 2020, Plaintiff Pena was

summoned to health care.  When he arrived, the nurse checked his heartbeat and temperature and

asked some medical questions.  She then informed Plaintiff that he was being placed on quarantine

status as a precautionary measure, in accordance with instructions issued by Defendant Warden

Brown.  Two correctional officers[2] escorted Plaintiff, who was in chains and shackles, to the

prisoners' visiting room, where he was held for 13 hours before being transferred to URF.  He was

not allowed to use the rest room, despite asking to do so for ten hours, ostensibly because

Defendant Warden Brown had ordered officers not to allow prisoners being quarantined out of the

room in which they were being held.  As a result, Plaintiff urinated and defecated on himself.

Once he arrived at URF, Plaintiff was placed in the administrative housing unit, in

a cell by himself.  As he was being escorted to his cell, Plaintiff told a correctional officer that he

had urinated and defecated on himself before being transferred.  Plaintiff requested a set of clean

---

[1] Plaintiff's chronology is questionable, given that no known cases of COVID-19 were confirmed in Michigan, in the MDOC, or at KCF in February 2020.  On March 10, 2020, Governor Gretchen Whitmer announced the first two confirmed COVID-19 cases in Michigan, both in the metro-Detroit area.  *See* Whitmer Press Conference, *Michigan governor says state has 2 confirmed coronavirus cases, declares state of emergency*, clickondetroit.com (Mar. 10, 2020); Michigan Executive Order 2020-04, Declaration of State of Emergency (Mar. 10, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html (visited Sept. 14, 2021).  The onset date of symptoms for the first subsequently confirmed COVID-19 case in an MDOC facility was March 2, 2020, *see* Cases and Deaths by County by Date of Onset of Symptoms and Date of Death, https://www.michigan. gov/coronavirus/0,9753,7-406-98163_98173---,00.html (visited Sept. 8, 2021), but the MDOC did not confirm its first staff case until March 17, 2020.  *See* MDOC Press release, https://www.michigan.gov/corrections/0,4551,7-119-1441_26969-522018--,00.html (last visited Sept. 2, 2021).  The first MDOC prisoner was confirmed COVID-19 positive on March 22, 2020.  *See Detroit Free Press*, "First Michigan prisoner tests positive for coronavirus," https://www.freep.com/story/news/local/michigan/2020/03/23/first-prisoner-tests-positive-coronavirus/2896984001/ (Mar. 23, 2020).

[2] The only KCF correctional officer named in the complaint is Defendant Unknown Party #1.  The Court assumes that Plaintiff Pena intends to allege that Defendant Unknown Party #1 refused to allow him to go to the restroom.

clothing.  The officer told Plaintiff, use the sink in the cell to wash himself and his clothing.  When Plaintiff questioned the logic, the officer stated that, on instructions from Defendant Warden Horton, he was to be placed in an administrative-segregation cell upon arrival and nobody was to let him out for any reason.

On March 26, 2020, Defendant Unknown Party #3 escorted prisoner Piggue to Plaintiff's cell to be housed with Plaintiff.  Plaintiff told Defendant Unknown Party #3 that prisoner Piggue and Plaintiff had never resided in the same unit before and had never had contact with one another.  Defendant responded that, under Defendant Warden Horton's instructions, all prisoners on quarantine status who were transferred to URF were to be assigned to segregation, two prisoners per cell.  Plaintiff asked for a toothbrush, toothpaste, deodorant, soap, a pen, writing papers, a grievance form, and law-library material.  Defendant Unknown Party #3 responded that he could not give him the things he requested, because, under Defendant Horton's orders, prisoners in quarantine were allowed only styrofoam food trays and one set of sheets, pillowcase, blanket, washcloth, and towel.

Plaintiff complains that, every time prisoner Piggue urinated or defecated, he left waste material on the floor and toilet bowl.  Plaintiff, however, was denied cleaning supplies. From March 26 through April 1, 2020, Plaintiff Pena was forced to use pieces of sheets, toilet paper, and water to clean the urine and feces on the floor and toilet bowl.

On March 28, 2020, Plaintiff informed an unknown nurse (Defendant Unknown Party #6) that he had developed a rash on his body.  Defendant Unknown Party #6 told Plaintiff that, when he got off quarantine status and returned to KCF, he should send a health-care request to the providers at KCF.  On March 30, Plaintiff told a second unknown nurse (Defendant

Unknown Party #7) about his skin rash, which was causing him pain.  Defendant Unknown Party #7 told Plaintiff the same thing as Defendant Unknown Party #6.

On March 29, 2020, an unknown correctional officer (Defendant Unknown Party #4) asked Plaintiff if he wanted to shower and informed Plaintiff that, if he did, he would be required to share the same shower shoes used by other prisoners or go barefoot.  When asked why, Defendant told Plaintiff that only one pair of shoes was available to quarantined prisoners during any shower shift, as the shoes had to be disposed of after the showers were completed.  Plaintiff elected to take a shower barefoot.  Because of a lack of hooks in the shower, Plaintiff had to place his clothes and towel on the shower floor, resulting in them getting wet.  Plaintiff had to put on the same (now wet) clothing he had been wearing since March 25, 2020.

On April 1, 2020, a different prison guard (Defendant Unknown Party #5) offered Plaintiff another shower.  Plaintiff complains that he had to use the same washcloth and towel he had been given on March 25, 2020, and he had to put on the same clothing again.

Plaintiff was transported back to KCF on April 1, 2020, at about 6:30 p.m.  On April 2, he sent a kite to health care, seeking treatment for his rash.  That same date, Plaintiff submitted a Step-I grievance to the grievance coordinator, complaining about everything that had happened between March 25, and April 1, 2020 (seven separate issues).  The grievance coordinator (presumably, Defendant Becher) returned the grievance to Plaintiff and instructed him to send it to URF.  Plaintiff rewrote the grievance and sent it to URF on April 8, 2020.  The URF grievance coordinator (presumably Defendant McLean) rejected the grievance on April 14, 2020, because it contained multiple issues.  Plaintiff appealed the rejection to Step-II and Step-III of the grievance process, both of which upheld the rejection.

Plaintiff Pena lists 25 separate "claims" arising out of these allegations.  He alleges that Defendant Warden Brown and Defendant Correctional Officer Unknown Party #1 violated the Eighth Amendment by refusing to allow him to use the bathroom and by keeping him in shackles and leg irons for hours.  He alleges that Defendant Horton and Defendant Correctional Officers Unknown Parties ##2–5 violated the Eighth Amendment by refusing to give him clean clothing after he urinated and defecated on the ones he was wearing; forcing him to stay nude in a cold cell while his clothes were drying; forcing him to remain in a cell with prisoner Piggue for seven days (March 26 through April 1, 2020); refusing to give him a toothbrush, toothpaste, deodorant, and soap for eight days; making him shower in bare feet and put on wet clothes; failing to give him a clean washcloth, towel, sheets, and change of clothing; and refusing to give him cell-cleaning supplies.  Plaintiff also alleges that Nurses Unknown Parties ##6 and 7 violated the Eighth Amendment by failing to treat his rash while he was in quarantine.  In addition, Plaintiff also alleges that Defendants discriminated against him, presumably in violation of the Equal Protection Clause, by not treating him like other prisoners in all of the previously listed instances, as well as by failing to give him access to legal and writing materials.  Further, Plaintiff alleges that Defendant Wardens Brown and Horton, Grievance Coordinators Becher and McLean, and Correctional Officers Unknown Parties ##3, 4, and 5 interfered with and conspired to interfere with his rights to due process and to seek redress of grievances by failing to process his grievances and failing to give him access to the courts by refusing to give him access to legal and writing materials.

Plaintiff Seaton's allegations are similar.  He complains that, on March 25, 2020, he was summoned to the KCF healthcare unit.  A nurse checked his vitals and then informed him that, as a precautionary measure, Defendant Brown instructed that Plaintiff be placed on quarantine

status for monitoring to determine if he had been exposed to COVID-19 by prisoner Daniels.  Two prison guards escorted Plaintiff to the prisoner visiting room, where he was to remain until he could be taken to URF. During the hours he waited, he asked the officer three times if he could use the restroom.  Eventually, the guard placed Plaintiff Seaton in shackles, ostensibly because Plaintiff kept complaining, and Plaintiff remained in shackles for four hours until the URF transportation officers arrived at 11:55 p.m. Plaintiff Seaton was not allowed to use a restroom for a total of 11½ hours, by which time he had urinated and defecated on himself.[3]

Once he arrived at URF, he informed Defendant Correctional Officer Unknown Party #2 that he had urinated and defecated on himself and needed a shower and clean clothing. Defendant Unknown Party #2 told Plaintiff that, according to the instructions he had been given, Plaintiff Seaton was to be taken to his cell in the segregation unit, and nothing but food trays could be passed in or out of the cell.  Defendant Unknown Party #2 told Plaintiff Seaton to bathe and wash his clothes in his cell sink.

At 8:00 a.m. on March 26, 2020, Plaintiff Seaton informed Defendant Correctional Officer Unknown Party #3 that he needed clean clothes, a washcloth, and a towel.  When Defendant denied his request, Plaintiff Seaton asked for grievance forms, writing papers, pens, and law material request forms.  Defendant Unknown Party told Plaintiff that he could not give Plaintiff the items and that, under Defendant Horton's instructions anything that came out of a quarantined prisoner's cell must be disposed of in the trash.

The following day, at about 3:50 p.m., Plaintiff asked Defendant Correctional Officer Unknown Party #4 to give him cleaning supplies, so that he could clean his cell and toilet.

---

[3] Plaintiff does not identify the correctional officers engaged in this conduct.  The Court assumes that the only named KCF correctional officer (Defendant Unknown Party #1) was involved.

Plaintiff Seaton, like Plaintiff Pena, complains that his cellmate urinated and defecated on the toilet

and floor every time he used the toilet.[4] Defendant Unknown Party #4 told Plaintiff that he could

not distribute cleaning supplies to Plaintiff. On March 28, 2020, an unspecified correctional officer

told Plaintiff that he could take a shower, but, if he did so, he would not be given another washcloth

or towel and would need to wear the same shower shoes as other prisoners or go barefoot. Plaintiff

Seaton decided not to take a shower under those circumstances.

Plaintiffs seek compensatory and punitive damages.

## II.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."). The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court

---

[4] Although Plaintiffs Pena and Seaton allege that their cellmates engaged in the identical unsanitary conduct, Pena and
Seaton did not share the same cell.

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III.    **Eighth Amendment**

The principal claims raised by both Plaintiffs involve alleged violations of the Eighth Amendment.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with

"deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

A.    **Plaintiff Pena**

Plaintiff Pena first alleges that Defendant Warden Brown and Defendant Correctional Officer Unknown Party #1 violated the Eighth Amendment by refusing to allow him to use the bathroom and by keeping him in shackles and leg irons for 13 hours. He also alleges that Defendant Horton and Defendant Correctional Officers Unknown Parties ##2–5 violated the Eighth Amendment in the following ways:  refusing to give him clean clothing after he urinated

10

and defecated on the ones he was wearing; forcing him to stay nude in a cold cell while his clothes were drying; forcing him to remain in a cell with prisoner Piggue for eight days; refusing to give him a toothbrush, toothpaste, deodorant, and soap for eight days; making him shower in bare feet and put on wet clothes; failing to give him a clean washcloth, towel, sheets, and change of clothing; and refusing to give him cell-cleaning supplies.  Plaintiff Pena also alleges that Nurses Unknown Parties ##6 and 7 violated the Eighth Amendment by failing to treat his rash while he was in quarantine.

### 1.      Defendants Brown & Unknown Party #1

Plaintiff Pena's allegations against Defendants Brown and Unknown Parties #1, concerning the unquestionably unpleasant conditions in which he was held immediately before his transfer, fail to rise to the level of an Eighth Amendment violation.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  "[N]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

"Conditions-of-confinement cases are highly fact-specific, but one guiding principle is that the length of exposure to the conditions is often paramount."  *Lamb v. Howe*, 677 F. App'x 204, 209 (6th Cir. 2017) (citing *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while substantial deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration.") (quotation omitted) ).  *See also Hutto v. Finney*, 437 U.S.

11

678, 686–87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.").  Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (flooded cell and inoperable toilet are temporary inconveniences); *see also Lamb*, 677 F. App'x at 209–10 (inmate's four-hour exposure to human waste due to flooded toilet water insufficient to state Eighth Amendment violation); *DeSpain*, 264 F.3d at 974 (exposure to feces via standing water for 36 hours does not violate the Eighth Amendment); *J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim.") (internal quotation omitted)); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003) (allegations of overcrowded cells and denials of daily showers and out-of-cell exercise do not rise to constitutional magnitude, where a prisoner is subjected to the purportedly wrongful conditions for six days one year and ten days the next year); *Siller v. Dean*, No. 99-5323, 2000 WL 145167, at *2 (6th Cir. Feb. 1, 2000) (denial of shower and other personal hygiene items for six days was not actionable under the Eighth Amendment); *Metcalf v. Veita*, No. 97-1691, 1998 WL 476254, at *2 (6th Cir. Aug. 3, 1998) (finding that an eight-day denial of showers, trash removal, cleaning, and laundry did not result in serious pain or offend contemporary standards of decency under the Eighth Amendment); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (eleven-day stay in unsanitary cell not unconstitutional because of relative brevity of stay and availability of cleaning supplies).

Defendant Unknown Party #1's refusal to allow Plaintiff to use a toilet while he was awaiting transfer is insufficient, by itself, to state a claim under the Eighth Amendment. *See*

12

*Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir. 1999) (stating that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment") (citing *Stephens v. Carter Cnty. Jail,* No. 86-5565, 1987 WL 36997 (6th Cir. Apr. 10, 1987)); *Park v. Holdren*, No. 1:17-cv-439, 2018 WL 1901798, at \*3 (S.D. Ohio Apr. 20, 2018) (holding that a prisoner's exposure to sewage flooding for 12 hours fell short of an Eighth Amendment violation). Moreover, even if the allegations supported the objective element of the deliberate-indifference standard, Plaintiff alleges that Defendants' refusal to allow Plaintiff to leave his cell to go to the bathroom arose from concerns in the early days of the pandemic about prisoners exposed to the COVID-19 virus using common areas with unexposed prisoners—not from malice or an indifference to Plaintiff's condition.  The stated reason for Defendants' conduct undermines a conclusion that either Warden Brown or Correctional Officer Unknown Party #1 possessed the requisite subjective intent under the second prong of the deliberate-indifference standard.

Plaintiff also vaguely complains about being kept in shackles and leg irons for 13 hours, though he does not complain that the restraints were too tight or that they caused him pain or injury.  The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy,* 559 U.S. 34, 37–39 (2010).  Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 6–7; *Wilkins*, 559 U.S. at 37.  In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response.  *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475 U.S. at 321); *accord*

*Griffin v. Hardrick*, 604 F.3d 949, 953–54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990).  Physical restraints are constitutionally permissible where there is penological justification for their use.  *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

Plaintiff Pena's vague claim concerning the duration of his shackling fails because it is clear from his allegations that there was a penological justification for the use of restraints, and, thus, the restraints were constitutionally permissible.  *Rhodes*, 452 U.S. at 346.  Plaintiff was being held in the visiting room with others until they could be transferred.  He was not being kept in a cell.  His shackling unquestionably was related to the need to restrain his movement and preserve order.  Because the penological justification for the restraints is apparent from the allegations, and because Plaintiff makes no allegations concerning the manner in which the restraints were applied, his Eighth Amendment claim fails.

Accordingly, Plaintiff Pena's Eighth Amendment claims against Defendants Brown and Unknown Party #1 will be dismissed.

## 2.    Defendants Horton & Unknown Parties ##2–5

Plaintiff Pena complains about the conditions in which he was kept for the seven-day period of his quarantine at URF.  During this time, Plaintiff was required to wash his soiled clothing in the cell sink, was not given clean clothing or a fresh towel and washcloth, was not given cleaning supplies, was not provided a toothbrush or toothpaste, and was required to clean with rags, despite having a cellmate who soiled the seat and floor when he used the toilet.  In addition, for six of his days of quarantine, Plaintiff was housed with another prisoner on quarantine who had not previously resided with Plaintiff.

14

Plaintiff's allegations against Defendants Horton and Unknown Parties ##2–5 fall short of establishing an Eighth Amendment violation.  Plaintiff was able to wash his clothing in his cell sink.  While unpleasant and not as satisfactory as having freshly laundered clothing, requiring Plaintiff to wash his clothing and wear the same clothing for seven days amounts to a temporary inconvenience.  This is especially true, given that Plaintiff was permitted to shower on two occasions during this period.  And the mere facts that Plaintiff was required to shower barefoot or use the same shower shoes as other inmates and that he had to use the same towel and washcloth for a week fall far short of implicating the Eighth Amendment.  *See Hudson*, 503 U.S. at 9 (mere unpleasantness or discomfort do not implicate the Eighth Amendment) (citing *Rhodes*, 452 U.S. at 347).

Further, Plaintiff's allegations concerning the lack of supplies to clean his cell raise relatively minor and temporary inconveniences.  *See Lamb*, 677 F. App'x at 209; *Foster v. Ohio*, No. 1:16-cv-920, 2018 WL 6726965, at *14 (S.D. Ohio Dec. 21, 2018) (recognizing that "'the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while *substantial* deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration.'") (emphasis in original; further internal quotations omitted) (quoting *DeSpain*, 264 F.3d at 974) (holding that both the length of exposure and the severity of the deprivation are important factors in evaluating the seriousness of the deprivation)).  The cell conditions that Plaintiff describes show that the cell may have been dirty, but it was not filthy as described in *Taylor v. Riojas*, 141 S. Ct. 52 (2020), where feces covered the walls and floors and were packed into the water faucet.  At most, Plaintiff suffered the dirty conditions for approximately one week.  As a consequence, Plaintiff's allegations about the sanitary conditions in his cell and the lack of

cleaning supplies fall short of meeting the objective component of the Eighth Amendment standard.

Next, Plaintiff complains that these Defendants denied him a toothbrush and toothpaste for the one-week period he spent at URF.  The Sixth Circuit has recognized that the complete denial of a toothbrush or toothpaste for an extended period may constitute an objectively serious deprivation of basic hygiene needs.  *See Flanory v. Bonn*, 604 F.3d 249, 255–56 (6th Cir. 2010) (holding that allegations that an inmate was deprived of toothpaste for 337 days and experienced dental health problems did not constitute a temporary inconvenience and were sufficient to state an Eighth Amendment claim).  However, a short-term denial of a toothbrush or toothpaste falls short of constituting such a deprivation.  *See, e.g., Matthews v. Murphy,* No. 90-35458, 1992 WL 33902, at *4 (9th Cir. Feb. 25, 1992) (holding that an inmate's allegations that he was deprived of a towel, toothbrush, toothpowder, comb, soap, and other personal hygiene items for approximately 34 days did not rise to the level of a constitutional violation); *Crump v. Janz*, No. 1:10-cv-583, 2010 WL 2854266, at *4 (W.D. Mich. July 19, 2010) (denial of toothbrush and toothpaste for 34 days constitutes a mere temporary inconvenience); *Robertson v. McRay,* No. 03-22823, 2006 WL 2136691, at *7 (S.D. Fla. July 28, 2006) (failure to provide indigent kits containing hygiene items and envelopes, stamps and paper more than half the time over a two-year period did not violate the Eighth Amendment); *Fernandez v. Armstrong,* No. 3:02CV2252CFD, 2005 WL 733664, at *5–6 (D. Conn. Mar. 30, 2005) (the denial of toothpaste, toothbrush, shampoo and soap for 16 days did not rise to the level of an Eighth Amendment violation where plaintiff did not allege any physical effects or injuries); *Holder v. Merline,* No. Civ. A. 05-1024 RBK, 2005 WL 1522130, at *6 (D.N.J. June 27, 2005) (three-week deprivation of a toothbrush and sneakers does not implicate the Eighth Amendment where no physical effects resulted).  Moreover, here,

16

unlike in *Flanory*, Plaintiff alleges no harm or risk of harm arising from his seven-day deprivation. *See Flanory*, 604 F.3d at 254 (recognizing that the objective component of the Eighth Amendment test is typically not met by temporary deprivations that result in no physical injury); *James v. O'Sullivan,* 62 F. App'x 636, 639 (7th Cir. 2003) (recognizing that a 49-day deprivation of soap, toothbrush and toothpaste may impair basic levels of sanitation and hygiene only if prisoner health and safety is jeopardized); *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996) (holding that a 69-day denial of toothpaste may constitute a constitutional deprivation if plaintiff had to be treated by a dentist for bleeding and receding gums and tooth decay).   Under these authorities, Plaintiff Pena's claim concerning the denial of a toothbrush and toothpaste for seven days fails to meet the objective component of the Eighth Amendment.

Finally, Plaintiff complains that, for six days, he was placed in the same cell with another prisoner who was on quarantine for a possible exposure to COVID-19, but apparently not to the same possible exposure that Plaintiff suffered.  Even assuming that COVID-19 presented an objectively serious risk on March 25, 2020,[5] Plaintiff's limited allegations about his exposure to possible cross-contamination from a different prisoner's COVID-19 exposure falls short of demonstrating the subjective element of the deliberate-indifference standard.

---

[5] On June 9, 2020, the Sixth Circuit described COVID-19 as follows:

> The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications or death.

*Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020).  The court held that "[t]he COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death," *id.* at 840, thereby meeting the objective prong of the deliberate indifference standard.  The court's assessment, however, was reached months after the allegations in the instant case, when far more was known about the objective seriousness of the risks in the context of a significant outbreak at the facility in issue.  *Id.* at 840.

Courts have recognized that "[p]risons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'" *Evdokimow v. Doll*, No. 4:21-CV-00261, 2021 WL 767554, at *6 (M.D. Pa. Feb. 26, 2021); *see also Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (recognizing the limited ability to socially distance in prison setting and concluding that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence.'") (quoting *Farmer*, 511 U.S. at 835). The relevant question on the subjective prong of the deliberate-indifference standard is not whether Defendants "perfectly responded, complied with every CDC guideline, or whether their efforts ultimately averted the risk[.]" *Benitez v. Sierra Conservation Ctr.*, No. 1:21-cv-00370, 2021 WL 4077960, at *5 (E.D. Cal. Sept. 8, 2021). This circuit's controlling "precedents do not require that prison officials take every possible step to address a serious risk of harm." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (citing *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014)). Instead, the "key inquiry is whether [they] 'responded reasonably to th[e] risk.'" *Wilson*, 961 F.3d at 840 (quoting *Farmer*, 511 U.S. at 844).

According to Plaintiffs' own allegations, Defendants transferred all potentially exposed prisoners to URF for placement in quarantine, and they placed limits on things coming into and going out of the quarantine cells, due to concerns about the risks of contamination to others through these transfers. The measures taken, if viewed in hindsight, might appear to have been inadequate, but they do not appear to have been unreasonable. *Id.* At this early stage of the pandemic—just two weeks after the first COVID-19 case was confirmed in Michigan—prison officials' adapted their protocols daily as more was learned about the level of risk, including the mode and degree of transmissibility, the likely outcomes associated with the disease, the particular

18

groups at risk, etc.  Prison officials were required to develop institutional practices to safeguard the health of both potentially exposed prisoners and the general prison population—all within the constraints imposed by a prison facility.  *See Evdokimow*, 2021 WL 767554, at *6 (noting the difficulties posed by prison facilities).  Early executive orders included restrictions on visitation and requirements for testing of persons entering congregate facilities.  *See* Michigan Executive Order 2020-06 (Mar. 13, 2020), temporary restrictions on entry into health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521676--,00.html (visited Sept. 14, 2021).  The governor subsequently issued a specific executive order directed at the MDOC on March 29, 2020, detailing additional and more specific protocols for managing the pandemic. Executive Order 2020-29  (Mar. 29, 2020), Temporary COVID-19 protocols for entry into [MDOC] facilities and transfers to and from Department custody; temporary recommended COVID-19 protocols and enhances early-release authorization, https://www.michigan.gov/ whitmer/0,9309,7-387-90499_90705-523422--,00.html (visited Sept. 14, 2021).  The MDOC, however, did not issue its first comprehensive plan (Director's Office Memorandum (DOM)) on the matter until April 8, 2020, two weeks after Plaintiff's quarantine.  *See* MDOC DOM 2020-30R (eff. Apr. 8, 2020).  When issued, the COVID-19 DOM set forth additional details about protective measures to be taken in all facilities:  describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies, setting protocols for COVID-19 testing

of prisoners; and making other necessary adjustments to practices to manage the pandemic.  Those practices have since been updated multiple times, reflecting the developing science around the virus, the recommendations of experts, and the conditions within the state.  *See* MDOC DOM 2020-30R2 (eff. May 26, 2020); MDOC DOM 2020-30R3 (eff. May 27, 2020); MDOC DOM 2020-30R4 (eff. Aug. 10, 2020); MDOC DOM 2020-30R5 (eff. Aug. 25, 2020); MDOC DOM 2020-30R6 (eff. Aug. 27, 2020); MDOC DOM 2020-30R7 (eff. Nov. 5, 2020); MDOC DOM 2020-30R8 (eff. Nov. 24, 2020); MDOC DOM 2021-26 (eff. Jan. 1, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R2 (eff. Jan. 21, 2021); MDOC DOM 2021-26R3 (eff. Jan. 25, 2021); MDOC DOM 2021-26R4 (eff. Mar. 5, 2021); DOM  2021-26R5 (eff. Mar. 19, 2021); DOM 2021-26R6 (eff. Mar. 26, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R8 (eff. Aug. 6, 2021); DOM 2021-26R9 (eff. Aug. 23, 2021).

The minimal facts alleged by Plaintiff Pena demonstrate that, at the time about which Plaintiff complains, Defendants took action to quarantine individuals, including Plaintiff, who may have been exposed to COVID-19:  they transferred exposed prisoners to another facility for a week, where they were placed in segregation cells with close association with only other exposed prisoners.  Defendants did not "disregard a known risk [to Plaintiff Pena] or fail to take any steps to address the risk." *Benitez*, 2021 WL 4077960, at *6 (citing *Wilson*, 961 F.3d at 843). At most, with the benefit of hindsight, they may have been negligent when they placed an exposed prisoner with a different source of exposure in the same cell with Plaintiff.  But allegations of negligence fall short of the deliberate indifference required to state an Eighth Amendment claim. *See Farmer*, 511 U.S. at 835 (holding that an Eighth Amendment violation requires a "state of mind more blameworthy than negligence"); *see also  Valentine v. Collier*, 956 F.3d 797, 803 (5th

Cir. 2020) (mere disagreement with the facility's COVID-19 procedures does not establish deliberate indifference).  As a result, Plaintiff Pena's claim against Defendants Horton & Unknown Parties ##2–5 for exposing him to possible cross-contamination from another prisoner fails to state an Eighth Amendment claim.

### 3.     Defendants Unknown Parties ##7–8

Plaintiff alleges that Defendant Nurses Unknown Parties #7–8 violated his Eighth Amendment right to adequate medical care on March 28, and March 30, 2020, respectively, when they declined to treat the rash he had developed on his feet and the side of his body.  Both Defendants advised Plaintiff to send a health-care request when he returned to KCF after his quarantine period ended.  Plaintiff acknowledges that, after he returned to KCF on April 1, 2020, he promptly sent a kite to health care.

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  Deliberate indifference may be manifested by a health care provider's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

As with other Eighth Amendment claims, a claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently

serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g., Rouster*, 749 F.3d at 446–51 (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. "[T]he official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . :  A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

Plaintiff's allegations fail to demonstrate that he suffered from an objectively serious medical need.  The fact that Plaintiff had a skin rash, without any other reported symptoms, does not demonstrate that a reasonable lay person would have been aware that he suffered from a sufficiently serious medical condition requiring immediate treatment. *Blackmore*, 390 F.3d at 899. Indeed, even at this juncture, Plaintiff does not allege the nature of his skin condition or describe facts suggesting the condition was serious.  Moreover, Plaintiff has not alleged or "place[d] verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment" caused by Defendant Unknown Parties ##7–8. *Napier*, 238 F.3d at 742.  Plaintiff Pena therefore cannot show that he was harmed by the delay of a few days.

For these reasons, the Court will dismiss all of Plaintiff Pena's Eighth Amendment claims against Defendants Brown, Horton, and Unknown Parties ##1–8.

**B.**    **Plaintiff Seaton**

Plaintiff Seaton raises only Eighth Amendment claims.  A number of his allegations are similar to but more abbreviated than those of Plaintiff Pena.

Plaintiff alleges that Defendant KCF Correctional Officer Unknown Party #1 denied Plaintiff Seaton's requests to use the toilet during an eight-hour period on March 25, 2020, while Plaintiff was in the prisoner visiting room, awaiting transport to URF.  As a result of being unable to use the restroom for a total of 11½ hours, Plaintiff Seaton urinated and defecated on himself.  At URF, Defendant Correctional Officer Unknown Party #2 denied Plaintiff Seaton's

request for clean clothing, stating that he was not allowed to pass anything but food trays into or

out of the cells of quarantining prisoners.  On March 26, 2020, Defendant Correctional Officer

Unknown Party #3 denied Plaintiff Seaton clean clothes, a washcloth, or a towel for the same

reasons, adding that any items removed from a quarantine cell had to be placed in the trash.  On

March 27, 2020, Defendant Correctional Officer Unknown Party #4 refused to give Plaintiff

Seaton cleaning supplies to clean his cell and toilet.  On March 28, an unspecified officer told

Plaintiff that he could take a shower, but Plaintiff declined when informed that he would not be

given another towel and would have to wear the same shower shoes worn by other prisoners.

Plaintiff Seaton alleges that Defendants Brown and Horton are responsible for the policies

implemented by Defendants Unknown Parties ##1–4.

   As with Plaintiff Pena, Plaintiff Seaton's allegations concerning Defendants Brown

and Unknown Party #1—the refusal to allow Plaintiff to use the bathroom at KCF while awaiting

transfer—fall short of demonstrating an Eighth Amendment violation.  Indeed, Plaintiff Seaton

alleges that Defendants Brown and Unknown Party #1 only denied his requests for 11½ hours, less

than the 13 hours alleged by Plaintiff Pena.  As a consequence, for the reasons provided for

rejecting Plaintiff Pena's claims, the Court concludes that Plaintiff Seaton's allegations against

Defendants Brown and Unknown Party #1 describe a temporary inconvenience that does not rise

to the level of an Eighth Amendment violation.  *See Hartsfield,* 199 F.3d at 310 (denial of bathroom

for 20 hours does not implicate the Eighth Amendment).

   Similarly, Plaintiff Seaton's allegations concerning his placement in restraints for

4½ hours reflect a significantly less intrusive imposition than the 13 hours of shackling endured

by Plaintiff Pena.  As the Court previously held, physical restraints are constitutionally permissible

where there is penological justification for their use, *see Rhodes*, 452 U.S. at 346; *Jones*, 1996 WL

24

67750, at *1, and the holding of Plaintiffs in the prisoner visiting room itself constitutes a valid penological justification for using shackles and leg irons.  Although Plaintiff Seaton makes a conclusory allegation that Defendant Unknown Party #1 placed him in shackles because he asked to go to the bathroom, he alleges no facts that would support this allegedly improper motive or that would undercut the penological justification.  Moreover, like Plaintiff Pena, Plaintiff Seaton makes no allegation that his shackles and leg irons were unreasonably tight or that he suffered any injury from the restraints.  Accordingly, for the reasons previously discussed, Plaintiff Seaton's claim against Defendants Brown and Unknown Party #1 concerning his shackling falls short of stating an Eighth Amendment claim.

With respect to URF Defendants Horton and Unknown Parties ##2–4, Plaintiff Seaton's allegations of Eighth Amendment violations are identical to those raised by Plaintiff Pena.  Having found those allegations to be insufficient under the Eighth Amendment with respect to Plaintiff Pena, the Court also will reject Plaintiff Seaton's Eighth Amendment claims against Defendants Horton and Unknown Parties ##2–4.

Plaintiff Seaton makes no Eighth Amendment claim or other allegations against Defendants Unknown Parties ##5–8.  It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants.  *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints.  *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the

25

complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries").  Because Plaintiff Seaton's claims fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"), his complaint must be dismissed against Defendant Unknown Parties ##5–8.

IV.   **Equal Protection**

Plaintiff Pena contends that all Defendants subjected him to discriminatory practices and treated him differently than other similarly situated prisoners, presumably claiming that he was denied his Fourteenth Amendment right to equal protection.

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiff Pena does not suggest that he is a member of a suspect class, and "prisoners are not considered a suspect class for purposes of equal protection litigation."  *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson v. Yaklich,* 148 F.3d 596, 604 (6th Cir. 1998).

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard.  *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006).  "Under rational basis scrutiny, government

action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)).  To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger*, 505 U.S. at 10; *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

Plaintiff fails to identify any similarly situated prisoner who was treated differently by Defendants with respect to the actions about which he complains.  His allegations concerning disparate treatment are wholly conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Moreover, Plaintiff's motion for class certification (ECF No. 9) suggests the opposite of disparate treatment; it suggests that a class of other prisoners in quarantine were treated similarly to Plaintiff.  Because his allegations fail to demonstrate disparate treatment much less intentionally and irrationally disparate treatment, Plaintiff Pena's equal protection claim will be dismissed for failure to state a claim.

V.    **Grievances and Access to Courts**

Plaintiff Pena alleges that Defendant Wardens Brown and Horton, Grievance Coordinators Becher and McLean, and Correctional Officers Unknown Parties ##3, 4, and 5

27

interfered with and conspired to interfere with his rights to due process and to seek redress of grievances by failing to process his grievances and failing to give him access to the courts by refusing to give him access to legal and writing materials.

Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

Plaintiff's right to petition government is not violated by Defendant's failure to process or act on his grievances.  The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Moreover, Defendants' actions have not barred Plaintiff from seeking a remedy for his grievances.  *See Cruz v. Beto*, 405 U.S. 319, 321 (1972).  "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th

Cir. 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)).

Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial

process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Even if Plaintiff had been

improperly prevented from filing a grievance by Defendants' interference or failure to provide

writing materials, his right of access to the courts to petition for redress of his grievances (i.e., by

filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he

therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*,

*Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817,

821–24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative

remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance

process, the process would be rendered unavailable, and exhaustion would not be a prerequisite

for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016)

(reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference

of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v.*

*Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001). In light of the foregoing, the Court finds that

Plaintiff Seaton fails to state a cognizable claim.

VI.    **Pending motion**

Plaintiff Pena has moved for class certification. Given the Court's dismissal of

Plaintiffs' complaint for failure to state a claim, the motion for class certification (ECF No. 9) will

be denied as moot.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the

Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28

U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide

whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiffs' claims are properly dismissed, the Court does not conclude that any issue either Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should either Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated:   September 23, 2021                              /s/ Hala Y. Jarbou
                                                                              HALA Y. JARBOU
                                                                              UNITED STATES DISTRICT JUDGE